# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Laithe Harris,                                    :
                        Petitioner                :
                                                  :
          v.                                      :     No. 402 C.D. 2020
                                                  :     Argued:  December 7, 2020
Unemployment Compensation                         :
Board of Review,                                  :
                        Respondent                :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge[1]
          HONORABLE J. ANDREW CROMPTON, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION BY JUDGE BROBSON**            **FILED:  March 17, 2021**


Laithe Harris (Claimant) petitions for review of an order of the Unemployment Compensation Board of Review (Board), dated April 1, 2020. The Board vacated a decision of an Unemployment Compensation Referee (Referee) and dismissed Claimant's appeal as untimely pursuant to Section 501(e) of the Unemployment Compensation Law (Law).[2]  For the reasons set forth below, we vacate the decision of the Board and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

The matter before us involves one of four appeals filed by Claimant from a series of determinations issued by the Duquesne UC Service Center

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson became President Judge.

[2] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 821(e).

(Service Center). The determinations primarily concerned earnings that Claimant failed to report in unemployment applications for claim weeks ending between 2012 and 2016. (Certified Record (C.R.), Item No. 8 at 3-4, 16.) Claimant filed a consolidated appeal of the determinations on October 3, 2019. (*Id.* at 13.) Claimant's appeal was separated into four subparts corresponding to the claim weeks at issue: No. B-19-09-H-4801 (H-4801); No. B-19-09-H-4803 (H-4803); No. B-19-09-H-4807 (H-4807); and No. B-19-09-H-4818 (H-4818). All of the appeals involve the same set of operative facts. The instant appeal is from H-4818, involving claim weeks ending January 2, 2016, through July 2, 2016. (C.R., Item No. 2 at 1-2.) The notices concerning H-4818 were mailed to Claimant in August 2016, while the other notices were mailed in April 2018. (C.R., Item Nos. 4, 8 at 3-7.) Section 501(e) of the Law provides that an appeal is timely if filed within fifteen days of the date the notice of determination was mailed. Claimant's filing in 2019, therefore, was untimely, and the Referee scheduled a hearing to determine in the first instance whether the appeals could proceed on the merits. (C.R., Item No. 8.) Claimant and his wife attended the hearing, but Claimant's employer did not appear. (*Id*. at 2.)

Claimant testified that he never received any of the notices. (C.R., Item No. 8 at 8-10.) Claimant stated that he was the victim of identity theft by his daughter, and, therefore, he believed the determinations were sent to his daughter's address. (*Id*.) At the time of the hearing, Claimant's address for the previous eleven years was a residence in Manchester, Pennsylvania, while his daughter resided in Carlisle, Pennsylvania. (*Id*. at 8.) The Referee confirmed that the Carlisle address was the address on file for Claimant at the time all of the notices were mailed. (*Id*. at 14.) The claim record states that Claimant's address was

changed on January 8, 2016. (C.R., Item No. 1 at 4.) Claimant testified that he never resided at the Carlisle address. (C.R., Item No. 8 at 11.) Claimant learned of the identity theft and potential fraud in late 2016 or 2017, and, thereafter, Claimant became engaged in investigations with the police, the Pennsylvania Department of Labor and Industry (Department), and the Federal Trade Commission (FTC). (*Id*. at 8-13.) Despite having worked with a Department investigator on the identity theft beginning in 2018, Claimant's address was not corrected in the unemployment system until August 20, 2019. (*Id*. at 11.) Claimant could not recall being asked to verify his mailing address by a Department representative at any point after learning of the identity theft. (*Id.* at 13-14.) On September 27, 2019, Claimant spoke with a Service Center representative who informed Claimant to file a late appeal of the determinations. (*Id*. at 13.) Claimant faxed his appeal on October 3, 2019. (*Id*.)

The Referee issued a decision as to appeal H-4818, concluding that Claimant's appeal could proceed *nunc pro tunc* under Section 501(e) of the Law because a breakdown in the administrative process caused the untimeliness of Claimant's appeal. (C.R., Item No. 12 at 3.) The Referee further concluded that Claimant was ineligible for benefits under Sections 401,[3] 401(c),[4] 4(u),[5] and 404(d)[6] of the Law, and that Claimant was responsible for a fault overpayment under Section 804(a) of the Law for the weeks ending January 9, 2016, through July 2, 2016, an amount totaling $14,071. (*Id*. at 4.)

---

[3] 43 P.S. § 801.

[4] 43 P.S. § 801(c).

[5] 43 P.S. § 753(u).

[6] 43 P.S. § 804(d).

3

Claimant appealed the Referee's decision to the Board as it related to the fault overpayment. (C.R., Item Nos. 13, 16.) The Board vacated the Referee's decision and dismissed Claimant's appeal as untimely. (C.R., Item No. 17.) In so doing, the Board issued its own findings of fact:

1. Effective December 20, 2015, the claimant applied for unemployment compensation benefits.

2. The claimant gave his personal identification number to his daughter, who lived with him, to file claims on his behalf.

3. On January 8, 2016, the claimant's address was changed to his daughter's new address in Carlisle, Pennsylvania.

4. On August 19, 2016, the Department . . . mailed to the claimant's last known address—in Carlisle—three determinations: (1) denying benefits to him; (2) establishing a $14,071.00 fault overpayment; and (3) imposing a $2[,]110.65 penalty.

5. The determinations notified the claimant that September 6, 2016, was the final day to file a valid appeal to a referee.

6. On February 27, 2017, the Internal Revenue Service mailed to the claimant a notice of tax deficiency for underreporting his receipt of benefits as income.

7. By March 24, 2017, the claimant had received at least the determination denying benefits to him.

8. On March 24, 2017, the claimant reported to police that his daughter was fraudulently filing claims for benefits using his application.

9. In January and February 2018, the claimant participated in the Department's investigation into his allegation against his daughter.

10. The claimant's appeal was filed on October 3, 2019.

(*Id*. at 1-2.)

The Board concluded there was no administrative breakdown because the determinations were mailed to Claimant's last known address. (*Id*. at 2.) Furthermore, while conceding that non-negligent circumstances caused Claimant not to receive the determinations, the Board noted that Claimant's time to appeal was not indefinite, and Claimant must have filed his appeal soon after learning of

4

the determinations or learning of facts that would cause him to inquire into their existence. (*Id*.) The Board went on to explain:

> The [Internal Revenue Service's (IRS)] February 27, 2017[] notice that the claimant received more benefits than reported triggered the claimant's duty. Further, the March 24, 2017[] police report notes the claimant had in his possession a determination denying benefits to him. On January 31, 2018, the claimant advised a Department audit and investigation specialist that he had received the overpayment determination. On February 5, 2018, the claimant further acknowledged that he received the overpayment determination. When he filed his appeal, the claimant stated, "This appeal is being filed late due to the fact that I was unaware of these incidents until late 2018."

> Despite the claimant's knowledge of some issue with his benefits on or about February 27, 2017, and his actual receipt of an adverse determination no later than March 24, 2017, the claimant did not file an appeal until October 3, 2019. This unexplained nearly three-year delay negates any justification the claimant would have had for filing a late appeal.

(*Id*. at 2-3.) Claimant now petitions this Court for review.

## II. ISSUES

On appeal,[7] Claimant argues: (1) substantial evidence does not exist to support the Board's findings of fact because the Board erroneously relied on evidence that is not a part of the record; (2) the Board erred as a matter of law in denying Claimant's appeal *nunc pro tunc*; and (3) equitable principles require that Claimant's appeal should proceed on the merits.

---

[7] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. 2 Pa. C.S. § 704.

# III. DISCUSSION

## A. Substantial Evidence

The Board's findings of fact are binding on appeal if, after a comprehensive review of the record, the findings are supported by substantial evidence. *Brandt v. Unemployment Comp. Bd. of Rev.*, 643 A.2d 78, 79 (Pa. 1994). Substantial evidence has been defined by this Court as "relevant evidence upon which a reasonable mind could base a conclusion." *Johnson v. Unemployment Comp. Bd. of Rev.*, 502 A.2d 738, 740 (Pa. Cmwlth. 1986). We examine the evidence and testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences that can logically and reasonably be drawn. *Id.* In determining whether the Board erred in issuing its findings, this Court is bound by the record below, and we cannot accept allegations of fact that are not supported by record evidence. *Hollingsworth v. Unemployment Comp. Bd. of Rev.*, 189 A.3d 1109, 1112-13 (Pa. Cmwlth. 2018).

Claimant argues that the Board improperly relied upon evidence that is not part of the certified record in this matter, and, therefore, the Board's decision is invalid on its face. Specifically, Claimant points to the Board's reliance upon an IRS notice dated February 27, 2017, and a police report from March 24, 2017. When the Board considers multiple appeals filed by the same individual, the Board's regulations permit it to consider evidence from the related records in the companion appeals. The Board's regulations provide:

> When the same or *substantially similar evidence is relevant and material to the matters at issue* in the petition for appeal concerning claims filed by more than one individual or, *in multiple appeals, filed by single individuals* or their authorized representatives, the same time and place for considering each appeal and claim may be fixed; hearings thereon jointly conducted; a single record of the proceedings made; *and evidence introduced with respect to an appeal or claim considered as*

6

*introduced with respect to appeals or claims if,* in the judgment of the Board or referee having jurisdiction of the proceeding, *such consideration will not be prejudicial to any party.*

34 Pa. Code § 101.22 (emphasis added).

Here, the IRS notice, the Northeastern Regional Police Department police report, and the Department's investigative report were introduced as evidence in Claimant's companion appeal, H-4801.[8] (C.R., Item No. 11 at 5-6.) As noted above, the four appeals filed by Claimant all concerned a common set of facts, and, therefore, the appeals were considered in a consolidated fashion at two referee hearings; one hearing considering the timeliness of the appeals and the other hearing considering the merits. At the outset of the two hearings, the Referee discussed the separate appeals and noted the documents being introduced that were relevant to each. (C.R., Item No. 8 at 3-8; C.R., Item No. 11 at 1-9.) Claimant did not object to the introduction of the documents. (C.R., Item No. 11 at 5-6, 9.) Accordingly, we conclude that the documents fall squarely within the ambit of 34 Pa. Code § 101.22, and we hold that the Board made no error in considering them on that basis for resolution of the instant appeal in H-4818. We further reject any argument Claimant makes regarding access to these documents. Claimant and his counsel have had access—at all times—to the records in all four appeals to the Board and to the record in the instant case and the case being heard seriately and docketed with this Court as *Harris v. Unemployment Compensation Board of Review*, No. 401 C.D. 2020.

### B. *Nunc Pro Tunc* Appeal

Claimant next argues that the Board erred as a matter of law in denying his appeal *nunc pro tunc*. Under Section 501(e) of the Law, an appeal must be filed

---

[8] The investigative report may have been introduced with regard to H-4803 as well as H-4801, but the transcript is somewhat unclear on this point. (*See* C.R., Item No. 11 at 7.)

within fifteen days from the date a determination is mailed to the claimant's last known address. At the conclusion of the fifteen-day period, the determination becomes final, and the Board no longer has jurisdiction to consider the matter. *Hessou v. Unemployment Comp. Bd. of Rev.*, 942 A.2d 194, 197-98 (Pa. Cmwlth. 2008). In limited circumstances, however, the limitations period can be waived, and the appeal will be considered timely as *nunc pro tunc*, or "now for then." *Id.* at 198. An appeal *nunc pro tunc* is only warranted, however, in extraordinary circumstances "involving fraud or some breakdown in the court's operation," or where the delay is caused by non-negligent circumstances either by the claimant or a third party. *Cook v. Unemployment Comp. Bd. of Rev.*, 671 A.2d 1130, 1131 (Pa. 1996) (internal quotations omitted) (quoting *Bass v. Cmwlth.*, 401 A.2d 1133, 1135 (Pa. 1979)). The Pennsylvania Supreme Court characterized administrative breakdown as occurring when "an administrative body acts negligently, improperly or in a misleading way." *Union Elec. Corp. v. Bd. of Prop. Assessment, Appeals & Rev.*, 746 A.2d 581, 584 (Pa. 2000). Where non-negligent circumstances cause the untimeliness of an appeal, the appeal must be filed within a short period of time after learning of the untimeliness. *Cook*, 671 A.2d at 1131. It is well-settled that the burden of demonstrating the necessity of *nunc pro tunc* relief is on the party seeking to file the appeal, and the burden is a heavy one. *Blast Intermediate Unit No. 17 v. Unemployment Comp. Bd. of Rev.*, 645 A.2d 447, 449 (Pa. Cmwlth. 1994).

Claimant challenges the Board's denial of his appeal *nunc pro tunc* on several grounds. He first argues that the fraud his daughter inflicted upon him excuses the untimeliness. Alternatively, Claimant alleges an administrative breakdown occurred because the determinations were all mailed to his daughter's address, and the Department failed to correct his address in its system until late 2019. In his final

allegation, Claimant challenges the Board's conclusion that, even if non-negligent circumstances caused the determinations to be mailed to the wrong address, Claimant had inquiry notice long before he filed his appeal, and, therefore, the untimeliness cannot be excused. Claimant argues the Board erred as a matter of law in imposing this inquiry notice.

### 1. Fraud

We first address the question of fraud. Claimant contends that where the circumstances surrounding a delayed appeal involve fraud, an appeal *nunc pro tunc* is warranted. Fraud, as contemplated in this Court's precedent, however, means fraud *by the administrative board or body* against a claimant. *Cook*, 671 A.2d at 1131; *see also Hessou*, 942 A.2d at 198 ("First, he can show the administrative authority engaged in fraudulent behavior or manifestly wrongful or negligent conduct."); *Blast Intermediate*, 645 A.2d at 449 ("[T]he statutory time limit for filing an appeal is mandatory in the absence of fraud or manifestly wrongful or negligent conduct of the administrative authorities."). Accordingly, while we do not question whether a fraud has been inflicted upon Claimant by his daughter, this fraud would not, under our case law, compel a finding that Claimant's appeal be considered timely.

### 2. Administrative Breakdown

As to the administrative breakdown, the Board concedes that an administrative breakdown occurred, but only with regard to the three related appeals filed by Claimant—H-4801, H-4803, and H-4807. The determinations for those appeals were mailed in April 2018. The Department investigator, after speaking with Claimant regarding the identity theft issue in January and February 2018, failed to update his correct address. As a result, the Board allowed the appeals in

9

H-4801, H-4803, and H-4807 to proceed *nunc pro tunc* due to administrative breakdown. The determinations in the instant matter, however, were mailed in August 2016. At that time, the Board was unaware that Claimant's address was incorrect. The Board argues that, because the determinations were mailed to Claimant's last known address, no administrative breakdown occurred, despite the fact that the address was incorrect.[9]

As noted previously, administrative breakdown occurs when the Department acts in a negligent or improper manner. For example, in *UPMC Health System v. Unemployment Compensation Board of Review*, 852 A.2d 467 (Pa. Cmwlth. 2004), we concluded that the Department's failure to address a determination to the correct zip code was an administrative breakdown for which the employer should not be punished. *UPMC Health Sys.*, 852 A.2d at 468, 471. The appeal in *UPMC Health System* was, therefore, allowed to proceed *nunc pro tunc*. Likewise, in *United States Postal Service v. Unemployment Compensation Board of Review*, 620 A.2d 572 (Pa. Cmwlth. 1993), we concluded that the Department's failure to mail a determination to the correct address, as provided to the referee at the outset of the referee hearing, constituted an administrative breakdown. *United States Postal*

---

[9] In support of its argument, the Board relies on *Duhigg v. Unemployment Compensation Board of Review*, 181 A.3d 1 (Pa. Cmwlth. 2017), for the proposition that, if the Department mails a determination to a claimant's last known—but incorrect—address, it does not constitute an administrative breakdown. The Board mischaracterizes the holding of *Duhigg*. There, while we did reach the conclusion the Board claims, it was only because the claimant failed to update her address after moving. *Duhigg*, 181 A.3d at 4-5. We reached a similar conclusion in *Ferraro v. Unemployment Compensation Board of Review*, 464 A.2d 697 (Pa. Cmwlth. 1983), where the claimant failed to update her address with the postal authorities more than two weeks after moving, and, as a result, she never received the determinations at issue. *Ferraro*, 464 A.2d at 698-99. While we disagree with the Board's characterization of *Duhigg*, we nevertheless reach the same conclusion that no administrative breakdown occurred, as explained in more detail hereafter.

*Service*, 620 A.2d at 574. In these cases, however, it was readily apparent there was fault on behalf of the Department.

By contrast, in the instant matter, there was no negligence or improper action by the Department with regard to mailing the determinations. The Department was unaware that Claimant's daughter changed Claimant's address in the Department's system. The determinations were also not returned as undeliverable. Thus, the Department mailed the determinations to Claimant's last known address, as required under Section 501(e) of the Law. Accordingly, we cannot conclude an administrative breakdown occurred.

### 3. Non-Negligent Circumstances

In the final segment of our *nunc pro tunc* analysis, we consider whether non-negligent circumstances should allow Claimant's appeal to proceed. The Board made several conclusions on this point. First, it held that non-negligent circumstances led to the determinations being mailed to the wrong address, *i.e.*, the intervening actions of Claimant's daughter was no fault of either Claimant or the Department. Nevertheless, the Board imposed a duty upon Claimant to inquire into the existence of the determinations, and it concluded that Claimant's duty was triggered when Claimant received the February 27, 2017 IRS notice, informing him of an additional income from unemployment. The Board stated that, at that point in time, Claimant should have learned of the notice of determinations and filed his appeal. Alternatively, the Board held that, whether or not Claimant had inquiry notice, Claimant had actual notice of the determinations by, at the latest, February 5, 2018. The Board based this conclusion on two documents: (1) a March 24, 2017 police report from Northeastern Regional Police Department regarding Claimant's charge against his daughter, which states that Claimant had in his possession an

11

adverse determination from the Department; and (2) a UC Fraud Investigation Report from a Department audit and investigation specialist detailing meetings with Claimant on January 31, 2018, and February 5, 2018, during which meetings Claimant noted he had in his possession the determinations. (C.R., Item No. 17; Suppl. Certified Record (S.C.R.), Item Nos. 1, 2.)

In reviewing a request for *nunc pro tunc* relief on non-negligent grounds, "[t]he question of whether there are unique and compelling facts, which establish a non-negligent failure to timely appeal, is a legal conclusion to be drawn from the evidence and is reviewable on appeal." *V.S. v. Dep't of Pub. Welfare*, 131 A.3d 523, 527 (Pa. Cmwlth. 2015). In *Cook*, our Supreme Court addressed the issue of notice and timeliness, stating:

> [W]here an appeal is not timely because of non-negligent circumstances, either as they relate to appellant or his counsel, and the appeal is filed within a short time after the appellant or his counsel *learns of and has an opportunity to address the untimeliness*, and the time period which elapses is of very short duration, and appellee is not prejudiced by the delay, the court may allow an appeal *nunc pro tunc*.

*Cook*, 671 A.2d at 1131 (emphasis added). Accordingly, a claimant must proceed with reasonable diligence *once he learns of the necessity to act*. *See also UPMC Health Sys.*, 852 A.2d at 470; *Stanton v. Dep't of Transp., Bureau of Driver Licensing*, 623 A.2d 925, 927 (Pa. Cmwlth. 1993). Less clear in our precedent is what an individual must do to *learn of* the necessity to act.

The Board directs this Court to *Ercolani v. Department of Transportation, Bureau of Driver Licensing*, 922 A.2d 1034 (Pa. Cmwlth. 2007). In *Ercolani*, the appellant alleged in support of his petition for an appeal *nunc pro tunc* that he never received a notice suspending his driver's license. *Ercolani*, 922 A.2d at 1036. The appellant attached a copy of his certified driving record to his petition, however,

which included a notice that the document had been mailed to him. Citing the "mailbox rule," we held the record of mailing to his correct address was sufficient to establish he received the document. *Id.* at 1037. Despite this conclusion, we noted that, regardless of whether he received the document in question, the appellant received a different letter shortly thereafter with similar information that gave him actual notice of the issue, and the appellant still waited a month or two before filing. This delay showed a lack of reasonable diligence and would, nevertheless, have precluded his *nunc pro tunc* petition. *Id*. at 1037-38.

We addressed a similar albeit distinct issue in *Croft v. Board of Property Assessment, Appeals & Review*, 134 A.3d 1129 (Pa. Cmwlth. 2016), which provides further instruction. There, a taxpayer purchased property in 1999 that consisted of two parcels, but the taxpayer was unaware of the property's separation. *Croft*, 134 A.3d at 1131. When the local property assessment office processed the deed, it erroneously transferred only one of the parcels to the taxpayer's name, leaving the second parcel in the name of seller. Over the following years, the taxpayer paid taxes on the one parcel but not on the second. In May 2013, the taxpayer's neighbor, a member of the city council, informed the taxpayer that his property was actually two lots and that a number of liens were assessed on the second lot. After learning of the issue through the neighbor, the taxpayer immediately began contacting local tax authorities to resolve the issue. The taxpayer then filed an appeal *nunc pro tunc* relating to the tax assessments on the second parcel dating back to 1999, but the trial court rejected his petition, holding, in relevant part, that he unreasonably delayed from first having notice of the issue in May 2013 to his filing in April 2014. *Id*. at 1133-34. Reversing the trial court's decision, we held, in the first instance, that the time of delay is not the defining factor in assessing a *nunc pro*

13

*tunc* appeal. While noting that time of delay is significant to the consideration, the Court stated the primary matter of concern is the *reason* for the delay, as *nunc pro tunc* relief is limited to cases where "unique and compelling factual circumstances [are] presented to the court." *Id.* at 1136 (quoting *Dep't of Transp., Bureau of Traffic Safety v. Johnson*, 569 A.2d 409, 411 (Pa. Cmwlth. 1990)). As it concerns due diligence, the *Croft* Court looked to the Pennsylvania Supreme Court's guidance in *Sprague v. Casey*, 550 A.2d 184 (Pa. 1988), where the Supreme Court explained:

> The correct inquiry in determining whether his conduct resulted in a want of due diligence is to focus not upon what the plaintiff knows, but what he might have known, by the use of the means of information within his reach, with the vigilance the law requires of him. *What the law requires of petitioner is to discover those facts which were discoverable through the exercise of reasonable diligence.* In the instant case, petitioner had not only to discover the facts surrounding his claim, but also to ascertain the legal consequences of those facts.

*Croft*, 134 A.3d at 1137 (quoting *Sprague*, 550 A.2d at 188) (emphasis added) (internal citations and quotations omitted). The *Croft* Court then held that the taxpayer had presented unique and compelling facts demonstrating that, from the time the taxpayer learned of the issue, he engaged in significant efforts to have it resolved, "weaving from one official to another among the [t]axing [a]uthorities until it became clear that he needed legal assistance." *Croft*, 134 A.3d at 1137. The *Croft* Court also noted as significant the fact that it was the taxpayer's own investigation, rather than that of the taxing authorities, that brought the issue to light, despite the fact the taxing authorities had the information at their disposal to discover and resolve the problem. *Id.* at 1134-35. It was, therefore, apparent that the taxpayer "exercised reasonable diligence to discover the facts underpinning his request to

14

appeal *nunc pro tunc* and the legal consequences of those facts," and his untimely appeal was allowed to proceed. *Id*. at 1137.

Accordingly, based on the foregoing, our review in the present case is focused on whether Claimant has presented unique and compelling facts demonstrating that: (1) if he had inquiry notice of his untimely appeal, he engaged in reasonable diligence to uncover the facts underlying his appeal (and the legal consequences thereof); or (2) if he had actual notice of his untimely appeal, he engaged in reasonable diligence to file his appeal within a reasonable time.

We first consider the question of inquiry notice. The Board argues that Claimant had inquiry notice as early as February 27, 2017, when he received the IRS notice, but that he unreasonably waited a year to first contact the Department. (Board Brief at 15.) The Board cites to the claim record, which indicates that Claimant contacted the Department regarding possible fraud on January 30, 2018. (C.R., Item No. 1 at 2.) The Board makes no mention of the five other notations in the claim record concerning Claimant's attempt to contact the Department regarding the identity theft, all of which predate the January 30, 2018 notation. The earlier notations are as follows: (1) a February 3, 2017 notation stating "LEFT VM @ 7:30 FOR CLT TO CALL ME DIRECTLY RE: POTENTIAL FRAUD ISSUE"; (2) three notations, all from March 2, 2017, stating in full: "SPOKE TO CLT RE: FRAUD; POSSIBLE DAUGHTER FILED FOR BENEFITS ON HIS CLAIM WHILE HE WAS WORKING . . . CLT ADV TO CONTACT ME WITH ADD'L INFO; ADV HIS CASE IS CURRENTLY PENDING PROSECUTION AND WE NEED TO KNOW IF SOMEONE OTHER THAN HIM FILED"; and (3) a notation on March 3, 2017, stating: "CLT CALLED STATED FILED POLICE REPORT." (C.R., Item No. 1 at 2.) Thus, according to the claim record, at the time the Board

15

is charging Claimant with inquiry notice, Claimant was in direct contact with the Department to inform it of the identity theft and that he was filing criminal charges against his daughter. (*Id.*) Claimant's testimony was that he contacted the Department immediately upon discovering the identity theft issue through the IRS. (C.R., Item No. 11 at 13.) There is no evidence that the Department furnished Claimant with the adverse notices of determination or even informed him of their existence. To the contrary, Claimant testified that when he first contacted the Department, a Department representative advised him to go to the IRS and file a claim there. (C.R., Item No. 8 at 9-10.) Claimant then contacted the Department again on January 30, 2018, which corresponds to this notation in the claim record: "CLMT CALLED IN CONCERNING POSSIBLE FRAUD; EXPLD TO FILL OUT ONLINE FORM, WHICH HE SAID HE DID 2WKS AGO." (C.R., Item No. 1 at 2.) The UC Fraud Investigation Report indicates that the Department investigator, Bonnie Haas, first met with Claimant in late January and early February 2018 and that it was Claimant's contact that triggered the investigation by the Department.[10] (S.C.R., Item No. 1 at 2-3.) Consequently, this is not a situation like *Ercolani*, where the individual received inquiry notice and did nothing. Rather, the facts here are more akin to *Croft*, where the taxpayer received inquiry notice and immediately contacted the relevant authority in an attempt to resolve the issue.

---

[10] The UC Fraud Investigative Report provides: "This investigation was initiated as a result of a UC Fraud Message submitted by Laithe Harris (claimant) alleging someone else filed for and received UC benefits under his name and social security number while he was fully employed." (S.C.R., Item No. 1 at 2.)

The Board's decision is similarly based upon a narrow review of the record as it relates to actual notice and the police and investigative reports.[11]  Again, like the taxpayer in *Croft*, Claimant engaged in significant efforts to resolve the issue from the outset.  Claimant testified and the claim record demonstrates that, after the IRS notified him of the additional unemployment income, he contacted the Department to inform it of the issue.  (C.R., Item No. 8 at 8-10.)  This contact is confirmed by the claim record.  (C.R., Item No. 1 at 2.)  Claimant testified that a Department representative instructed Claimant to work on the issue with the IRS and later advised him to file a claim with the FTC, both of which he did.  (C.R., Item No. 8 at 10.)  The claim record and Identity Theft Form, which form Claimant generated with the Department, further confirm that Claimant filed criminal charges against his daughter and participated in an investigation with the Northeastern Regional Police Department into her actions.  (C.R., Item No. 1 at 2; S.C.R., Item No. 2 at 1-7.)  The UC Fraud Investigation Report shows that it was Claimant who contacted the Department and initiated the fraud investigation, which resulted in Claimant meeting with a Department investigator on two separate occasions and providing information regarding his daughter's actions.  (S.C.R., Item No. 1 at 2-3.)  Thus, over the time period in question, Claimant was involved in four different investigations with state, local, and federal authorities, including a criminal

---

[11] We also note here that both documents are hearsay.  Hearsay is an out-of-court statement that a party offers in evidence to prove the truth of the matter asserted in the statement.  Pa. R.E. 801(c).  The police report and UC Fraud Investigation Report were drafted long before the Referee hearing, they were offered at the Referee hearing for the truth of the matter asserted in the reports, and neither document was validated by the Department investigator Bonnie Haas or Officer Scott George, the creators of the documents.  Claimant did not preserve the issue for appeal by including it in the statement of questions presented or argument section of his brief to this Court, however, and, therefore, we are prevented from disposing of this case on the grounds that the documents are hearsay.  *See* Pa. R.A.P. 2116(a), 2119(e).  Rather, Claimant addresses the potential hearsay nature of the documents in his reply brief in response to statements in the Board's brief.

investigation against his own daughter, in an attempt to resolve the issue. These circumstances suggest that Claimant did not, by any means, sit on his hands, although neither the Referee nor the Board engaged in such an analysis.

Most troubling to this Court, however, is the fact that, despite Claimant having been in contact with the Department beginning in 2017, and working with a Department investigator in 2018, Claimant's testimony is that he first learned he should file a late appeal on September 27, 2019, after speaking with a Service Center representative. (C.R., Item No. 8 at 13.) According to Claimant, at no time did he receive any direction from the Department to file a *nunc pro tunc* appeal, and there is no other evidence that Claimant was aware prior to September 27, 2019, that he should or could file a late appeal. The facts do show, however, that Claimant received instructions from the Department advising him to engage in a number of efforts that did *not* include filing an appeal. As noted previously, these instructions included (but may not be limited to) working with the IRS to gain information regarding the additional income, filing a claim with the FTC, and aiding a Department investigator in an investigation into his daughter's actions.[12]

We note that the facts of this case are exceptional—they may be exactly what this Court considered in *Croft* when it recited the principle that *nunc pro tunc* relief is reserved for "unique and compelling factual circumstances." *Croft*, 134 A.3d at 1136. It appears to this Court, however, that the Board did not consider the totality of the "unique and compelling factual circumstances" presented in this case to determine whether Claimant engaged in reasonable diligence in filing his appeal. Rather, it appears that the Board misapprehended the breadth of the inquiry

---

[12] Claimant may have believed his actions with regard to the various investigations, including the investigation conducted by the Department, were part of the process to resolve the identity theft matter in relation to the notice of determinations at issue in this case.

18

necessitated by the circumstances of this case, which could require consideration of both the actions of Claimant and the Department. Along those lines, Claimant testified that the Department failed to cooperate in the investigation of the criminal charges in this matter, thereby resulting in the failure of the police to file criminal charges against Claimant's daughter. (C.R., Item No. 11 at 15.) If Claimant's testimony is to be believed, the Court is somewhat perplexed at the notion that the Department, while seeming to agree that Claimant's daughter engaged in identity theft to the detriment of both the Department and Claimant, chose to pursue the matter in the present forum rather than the criminal courts. It appears to the Court that the Department may have relied upon the information provided by Claimant to form the basis of its efforts to recoup its loss against him, while not informing him of his appeal options or taking action against Claimant's daughter. These circumstances are troubling to the Court, especially considering the narrow analysis applied by the Board in considering whether *nunc pro tunc* relief is warranted. Accordingly, we must vacate the Board's decision and remand for further proceedings, including an evidentiary hearing to allow the parties to provide evidence on this issue of reasonable diligence.

## IV. CONCLUSION

For the reasons set forth above, we vacate the decision of the Board and remand for further proceedings consistent with this opinion.

_____
P. KEVIN BROBSON, Judge

19

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Laithe Harris,                                    :
                          Petitioner              :
                                                  :
          v.                                      :     No. 402 C.D. 2020
                                                  :
Unemployment Compensation                         :
Board of Review,                                  :
                          Respondent              :

# O R D E R

AND NOW, this 17th day of March, 2021, the order of the Unemployment Compensation Board of Review is VACATED, and the matter is REMANDED to the Board for further proceedings consistent with this Opinion.

Jurisdiction relinquished.

_____
P. KEVIN BROBSON, Judge